OPINION
{¶ 1} Plaintiffs-Appellants, Dennis E. Howick, David H. Howick, Harold E. Howick, Ralph W. Bomholt, Luke Springer, Jacqualyn Springer, Florentine Rose, and V. Marjorie Miesse (hereinafter jointly referred to as "Appellants"), *Page 3 
appeal the judgment of the Mercer County Court of Common Pleas granting summary judgment in favor of Defendants-Appellees, Fanning/Howey Associates, Inc. (hereinafter referred to as "Fanning/Howey"), John Irmscher, Thomas Knapke, Charles E. Samples, Lakewood Village Limited Partnership (hereinafter referred to as "Lakewood"), Irmscher Development, Inc. (hereinafter referred to as "Irmscher Development"), F/H Investments, Inc. (hereinafter referred to as "F/H Investments"), Knapke Associates, Inc. (hereinafter referred to as "Knapke Associates"), and Samples Associates, Inc. (hereinafter referred to as "Samples Associates"). On appeal, Appellants assert that the trial court erred in granting summary judgment in favor of Fanning/Howey, Irmscher, Knapke, and Samples; that the trial court erred in ruling that they did not justifiably rely on public and private representations made by Irmscher; that the trial court erred in ruling that Fanning/Howey, Knapke, and Samples did not conceal nor have fraudulent intent to conceal statements made by Irmscher; that the trial court erred in ruling that Bomholt was not concerned with who the general partners of Lakewood were, because he dealt with Irmscher; and, that the trial court erred in ruling that Miesse and Rose were unable to demonstrate that they relied upon any representations made by Irmscher. Based on the following, we affirm the judgment of the trial court in part, reverse in part, and remand the matter for further proceedings consistent with this opinion. *Page 4 
 {¶ 2} In the early 1990s, Irmscher began negotiating with local farmers for the purchase of real estate to develop the Eaglebrooke housing and golf course development outside of Celina, Ohio (hereinafter the housing and golf course development is referred to as "Eaglebrooke"). Through his negotiations, Irmscher personally entered into a real estate purchase agreement with Rose and her husband, Arlington Rose, (hereinafter jointly referred to as "the Roses"), in July 1990, and closed on their real estate in August 1990, executing and delivering a promissory note to the Roses. Additionally, Irmscher obtained an option to purchase real estate from Harold, Dennis, and David Howick (hereinafter jointly referred to as "the Ho wicks") in August 1990 and from Bomholt in December 1991. While obtaining real estate for Eaglebrooke, Irmscher realized that he would be unable to complete the project by himself and decided to form a limited partnership, which was noted in The Daily Standard, a newspaper in Celina, Ohio.
 {¶ 3} After more negotiations, Irmscher obtained options to purchase real estate, which expired in April 1994, from Luke and Jacqualyn Springer (hereinafter jointly referred to as "the Springers") in April 1993 and from Robert Miesse[1], Miesse's late husband, in May 1993. Additionally, the Springers' and Robert Miesse's option agreement contained a clause which allowed Irmscher to *Page 5 
assign the option to any "corporation or partnership formed for the purpose of constructing the golf course and housing development."
 {¶ 4} Additionally, in June 1993, the Roses agreed to allow their promissory note to be "assumed by the corporation or partnership to be formed by Irmscher to develop the golf course and housing project [and to] have [the real estate they sold to Irmscher] released from the lien of the Mortgage" for additional consideration and substitute collateral. (Joint Ex. No. 62).
 {¶ 5} After further negotiations, Irmscher obtained new options, which expired in April 1994, to purchase real estate from Bomholt in July 1993 and from the Howicks in October 1993. Additionally, the new option agreements contained a clause which allowed Irmscher to assign the option to any "corporation or partnership formed for the purpose of constructing the golf course and housing development."
 {¶ 6} On February 25, 1994, Lakewood was created with Irmscher Development, F/H Investments, Knapke Associates, and Samples Associates (hereinafter collectively referred to as "General Partners") listed as the general partners.[2] On February 29, 1994, Lakewood filed its Certificate and Agreement of Limited Partnership with the Mercer County Recorder's Office, which listed *Page 6 
Irmscher Development, F/H Investments, Knapke Associates, and Samples Associates as its general partners.
 {¶ 7} On March 9, 1994, a meeting of the land owners[3] was called[4] to meet the general partners of Lakewood and to ask the land owners to extend their options. At this meeting, those in attendance were given an "AGENDA FOR MEETING" "RE: MEETING WITH LAND OWNERS ON 3/9/94", which had "LAKEWOOD VILLAGE LIMITED PARTNERSHIP" written on top and included an address and phone number for Lakewood. (Bomholt Dep. Ex. 5) (emphasis in original). During Irmscher's deposition, he provided the following testimony about what happened at this meeting:
 Q. Did you explain Lakewood and what the generals (Sic.) relationship was to Lakewood [at the March 9, 1994 meeting]? A. Yes, I explained their role. And as an example, I explained why these people had been brought in related to their expertise. So one of the things I had done is [Knapke], as an example, originally was a limited partner. But [Knapke] and I had *Page 7 worked on the Y together in fund raising projects through the community. Due to the law, the real estate law, [Knapke] could not sell the offering document without being a general. The only people that could sell units were the term, general.
 So I explained [Knapke's] role, that he and I would make contracts from a marketing standpoint to raise funds and what our function would be. [Samples'] expertise, at that time he was primarily a housing builder, and [Fanning/Howey], as you used the term, was an architect, so the explanation of the four diverse investors, how they fit in this project.
 * * *
 Q. The reason you needed the [option extensions asked for at the March 9, 1994 meeting] was because you could not exercise the option until you had made the second offering; is that correct?
 A. That is correct.
 Q. All right. At the March 9 meeting did you introduce any of the generals as presidents or as directors of their respective corporations that they had formed?
 A. I don't remember how I introduced them, but I did, I remember going through the structure that it was corporate, especially with [Knapke's] example, because he had moved from a limited to a general, like the other three of us.
 Q. But did you reveal the fact that [Knapke] had formed a corporation to limit his personal liability to the farmers?
 A. I don't remember.
 Q. Do you recall whether you expressed or explained to the farmers at that meetings (Sic.) that you had one month earlier formed a corporation that would limit your personal or individual liability to the farmers on the obligations that Lakewood was about to sign to them?
 A. Uh-huh.
 Q. Did you do that?
 A. I don't remember, but I do remember, if you look at the option agreements with all of them, the option agreement clearly states that this is an assignable because we didn't know what our entity would be and that was explained. So if you look at the, okay, as I mentioned these option agreements were staggered.
 The last option with the farmers prior to this March meeting, all of those were coordinated to expire in April. They were all timed the same. * * *. *Page 8 
 Q. * * * Then let's have you say what you said to the farmers in that [March 9, 1994] meeting about the corporate structure.
 A. Okay. The best that I can remember is that taking these partners and explaining our corporate structure at the bank, because it's more complex than that * * *. I explained our corporate structure with the bank and why we had limitation.
 Q. Which corporate structure were you explaining?
 A. That each of us had formed a corporation and that's how we signed our bank papers with the bank.
 Q. Are you telling me that you said this to the group of farmers on March 9?
 A. Correct, to the best of my recollection. Because it was important that their collateral was land. If you look at each one of their options, the final option that was written, that had this April date that needed to be extended, that each one individually had negotiated that option on collateral.
 If you review the document, there was a formula that we used because there were not platted lots, so we used a boundary considered to be a lot, and different one of their representatives, whoever their professional opinion came in, that was one other thing, if you look at the agreements that was not the same nor was the price or the terms.
 If you look at those options, the majority of them were witnessed by an attorney. And we had dealt with each one of them trying to solve problems that they had. Because in the farming field a number of them had very low basis in their original property and their concern was, for tax purposes. So from a professional advice, we used a tax attorney at Vorys. And as you're aware, attorneys cannot talk to somebody else's clients, so they would have been involved in giving some scope that their accountant or attorney could look at to review.
 * * *.
 Q. Did you explain at the March 9, 1994 meeting who the general partners of Lakewood were?
 A. Correct.
 Q. Do you remember who you identified as being general partners of Lakewood?
 A. I identified that the general partners would have been [Samples], [Fanning/Howey]'s representative, I explained that Kent Bryan was assigned by [Fanning/Howey] because Ron *Page 9 Fanning was never was involved in our project. He never came to a meeting. And then [Knapke]. So going through who they were and what their roles and purposes were based on their fulltime profession. * * *
 Q. * * * Who were the general partners?
 A. The general partners were, the individuals were [Samples] as [Samples Associates], [Knapke] through [Knapke Associates], and then Kent Bryan as the representative for [F/H Investments], and myself.
(Irmscher November 10, 2004, Dep. pp. 29-30, 34-38, 110-12).
 {¶ 8} Additionally, Luke Springer's affidavit filed with Appellants' response to the motions for summary judgment provided that at the March 9, 1994 meeting, Irmscher introduced Kent Bryan, as a representative of general partner Fanning/Howey, Knapke, and Samples as general partners in Lakewood and described their roles in Eaglebrooke; that Irmscher, Fanning/Howey, Knapke, and Samples never indicated that they created special corporations to be the general partners of Lakewood; that he was impressed with the reputations of Fanning/Howey, Knapke, and Samples; that Irmscher made other personal representations prior to the March 9, 1994 meeting that Fanning/Howey, Knapke, and Samples were general partners in Eaglebrooke; that he read The Daily Standard articles, which discussed Irmscher's public statements and other statements Irmscher made at Celina City Council meetings about Fanning/Howey, *Page 10 
Knapke, and Samples being his general partners[5]; and, that relying on all of this information, which he also relayed to Jacqualyn, he and his wife decided to extend the deadline of their option agreement.[6]
 {¶ 9} Additionally, Douglas Bomholt, Bomholt's son, provided an affidavit, which indicated that he attended the March 9, 1994 meeting on his father's behalf and that he asked Ralph Weitzel[7], his brother-in-law, to attend with him; that at the meeting, Irmscher introduced himself as the managing partner of Lakewood, Fanning/Howey as the general partner that would prepare drawings, lay out the subdivision, help prepare grant applications, and invest some amount of cash in the project, Kent Bryan as Fanning/Howey's representative, Knapke as a general partner who would contribute $25,000 and bring his special knowledge of fundraising and business finance to the project, and Samples as a general partner who would be in charge of installing the streets and sewers; that he had informal *Page 11 
conversations with Kent Bryan, Knapke, Samples, and Irmscher, and they never revealed that they were forming corporations to be the general partners in Lakewood; that he did not hear the words "Irmscher Development, Inc.", "F/H Investments, Inc.", "Knapke Associates, Inc.", and "Samples Associates, Inc." at the meeting nor did he hear that Irmscher, Fanning/Howey, Knapke, and Samples had formed corporations to be general partners in Lakewood; that Irmscher visited his father's home six times between 1993 and 1994 and during these visits, Irmscher had told Bomholt that his partners would be Fanning/Howey, Knapke, and Samples; that he and Bomholt had read The Daily Standard articles[8]; and, that he advised his father to stay in this project because Irmscher, Knapke, and Ron Fanning[9] were successful businessmen.
 {¶ 10} Dennis Howick[10] also provided an affidavit, which indicated that neither he, David Howick[11], nor anyone in his family decided to attend the March 9, 1994 meeting; that on March 10, 1994, Irmscher came to his home and made a presentation to the Howicks; that during this presentation, Irmscher said that his general partners, which he had numerous times previously identified as Knapke, Samples, and Fanning/Howey, had committed to investing money besides their expertise and work; that Irmscher asked them to extend their option so that he *Page 12 
could obtain more investment money; that the Howicks agreed to extend their option; that in deciding to extend their option, Harold relied upon Irmscher's private representations and The Daily Standard
articles[12] that the partners in Eaglebrooke were Irmscher, Fanning/Howey, Knapke, and Samples; and, that if his family had known that Irmscher, Knapke, Samples, and Fanning/Howey were not making a personal commitment to the project, they would not have agreed to sell their family farm.
 {¶ 11} Rick Rose, the Roses' son and the executor of Arlington Rose's estate, provided an affidavit, which indicated that his parents had told him that Irmscher had formed a partnership with Fanning/Howey, Knapke, and Samples to create Eaglebrooke; that his parents had told him that they went to the March 9, 1994 meeting in order to meet the general partners; that his parents told him that at the meeting, Irmscher introduced himself as the managing general partner of Lakewood and that there were three general partners, Fanning/Howey, represented by Kent Bryan, who would perform engineering and invest money, Knapke, who would invest money and help raise more money from investors, and Samples, who would act as the general contractor and create the subdivision; that Irmscher asked his parents to allow him to assign his promissory note obligation to Lakewood; that his parents had considered the contents ofThe Daily Standard articles *Page 13 
regarding Irmscher's partners, because they confirmed what Irmscher had told them privately in their home[13]; and, that his parents agreed to allow Irmscher to assign his promissory note obligation to Lakewood.
 {¶ 12} In Miesse's deposition, she testified that she sat in on every meeting, which totaled somewhere between three and six, between Robert and Irmscher at Miesse's home; that Irmscher had mentioned that he required additional funding to create Eaglebrooke from Fanning/Howey, Knapke, and Samples; that Irmscher had indicated to Robert and her that Fanning/Howey, Knapke, and Samples were general partners in Lakewood with Irmscher; that Robert and she relied on Irmscher's statements to them that Fanning/Howey, Knapke, and Samples were general partners; and, that Robert relied on the The Daily Standard articles[14] and on the strength and roles of the individuals in Lakewood, when he agreed to option his real estate.
 {¶ 13} On March 15, 1994, Lakewood filed its partnership records with the Secretary of State, including a Report of Use of Fictitious Name, which listed Irmscher Development, F/H Investments, Knapke Associates, and Samples Associates as general partners. On the same day, Bomholt, the Howicks, the Springers, and Robert Miesse agreed to amendments extending the expiration date of their respective options to July 14, 1994. Also on March 18, 1994, the Roses *Page 14 
agreed to extend the closing date of their real estate purchase agreement until August 16, 1994.
 {¶ 14} In July 1994, Irmscher exercised the options on Bomholt's, the Howicks', Robert Miesse's, and the Springers' real estate.
 {¶ 15} In August 1994, Irmscher assigned his rights under and interests in the option agreements to Irmscher Development, which assigned its rights under and interests in the option agreements to Lakewood. Lakewood closed on the transactions, which resulted in the transfer of Bohmolt's, the Howicks', Robert
Miesse's, and the Springers' real estate to Lakewood, and promissory notes were issued for portions of the purchase prices and were secured by real estate mortgages.[15] Additionally, Lakewood assumed the Roses' promissory note, which included in the agreement that Irmscher would not be personally liable on the promissory note under Lakewood's assumption.[16]
 {¶ 16} Payments were made on the promissory notes until July 2002, when Lakewood defaulted on the promissory notes. *Page 15 
 {¶ 17} In June 2004, Appellants filed a complaint against Appellees, which was later amended in October 2004. In their amended complaint, Appellants asserted three claims against Appellees. Specifically, in their first claim, Appellants brought an action in contract against Lakewood, because Lakewood defaulted on the promissory notes. In their second claim, Appellants sought to impose joint and several liability upon General Partners for the losses on notes executed by Lakewood. In their third claim, Appellants sought to impose personal liability upon Irmscher, Fanning/Howey, Knapke, and Samples for losses on the promissory notes executed by Lakewood.
 {¶ 18} In July 2004, Fanning/Howey moved to dismiss Appellants' complaint insofar as it asserts allegations against it. Also, Irmscher and Knapke, each as individuals, moved to dismiss Appellants' complaint under Civ.R. 12(b)(6) insofar as the complaint asserted allegations against each of them as individuals.
 {¶ 19} In August 2004, Appellants filed a joint motion for partial summary judgment on the defaulted promissory notes from Lakewood to Appellants. In addition, Appellants filed a supplemental complaint against Irmscher alleging that he had transferred 10.367 acres of land out of Lakewood, in violation of the Ohio Uniform Fraudulent Transfer Act, so that they could not collect on their judgment against Lakewood. *Page 16 
 {¶ 20} In September 2004, Irmscher moved to dismiss Appellants' supplemental complaint.
 {¶ 21} In November 2004, Irmscher, individually, filed a counterclaim against Rose seeking costs of his defense, because the Roses entered into an agreement which provided that they would not sue him individually for any amounts due under their contractual relationship.
 {¶ 22} Later, in November 2004, the trial court granted Appellants' joint motion for partial summary judgment and ordered judgment against Lakewood for each Appellant respectively.
 {¶ 23} In July 2005, the trial court overruled both Fanning/Howey's July 2004 and Irmscher's September 2004 motion to dismiss.
 {¶ 24} In October 2005, Fanning/Howey moved for summary judgment against Miesse. Specifically, Fanning/Howey argued that Miesse did not have standing to bring an action for fraud, because she was not a party to the underlying transaction between Robert Miesse and Irmscher and Lakewood; that she was not an owner of the property that was sold to Lakewood; that the promissory note from which she brings her action was given to Robert Miesse; and, that there is no evidence that the promissory note was transferred to her. In addition, Fanning/Howey moved for summary judgment against Rose. Specifically, Fanning/Howey asserted that because Rose failed to appear for her properly *Page 17 
noticed deposition, her claim should be dismissed under Civ.R. 37. Also, Fanning/Howey moved for summary judgment against Bomholt, the Springers, and the Howicks, because they sought to hold it liable for alleged fraudulent acts in which it did not participate. Also in October 2005, Samples, Irmscher, and Knapke moved for summary judgment against Appellants on the allegations set forth in the third claim in their amended complaint.
 {¶ 25} In January 2006, Appellants filed a response to the motions for summary judgment and moved to amend their amended complaint by substituting Dennis Howick as the Guardian for his incompetent father, Harold Howick, and Rick Rose for his incompetent mother, Florentine Rose, and by adding two parties, Rick Rose, as the Executor of the Estate of Arlington Rose, Deceased, and Miesse, as the Executor of the Estate of Robert O. Miesse, Deceased. Fanning/Howey and Samples filed responses to Appellants' motion to amend their amended complaint.
 {¶ 26} In February 2006, Fanning/Howey filed replies in support of its motions for summary judgment against Appellants and moved to strike Luke Springer's affidavit, because it contradicted his deposition testimony. Also, Knapke, Irmscher, and Samples filed a reply in support of their motions for summary judgment against Appellants. *Page 18 
 {¶ 27} In March 2006, Appellants filed a reply to the responses to their motion to amend their amended complaint to include additional parties, which included a proposed second amended complaint.
 {¶ 28} In April 2006, Samples moved to suppress his deposition.
 {¶ 29} In May 2006, Knapke, Irmscher, and Samples filed motions in limine. In June 2006, the trial court granted Fanning/Howey's, Knapke's, Irmscher's, and Samples' motions for summary judgment, which related to Appellants' third claim of their complaint. Specifically, the trial court granted summary judgment on Appellants' claims of fraud and partnership by estoppel.
 {¶ 30} In July 2006, Appellants appealed the June 2006 judgment of the trial court.
 {¶ 31} In August 2006, the trial court entered a stipulated notice of dismissal without prejudice and nunc pro tunc order of entry of final judgment. Specifically, the entry indicated that the trial court disposed of Appellants' first claim of their amended complaint in its November 2004 judgment entry granting Appellants' motion for partial summary judgment; that the trial court disposed of Appellants' third claim of their amended complaint in its June 2006 judgment entry granting summary judgment in favor of Irmscher, Fanning/Howey, Knapke, and Samples; and, that the only claims remaining were Appellants' second claim in their amended complaint and Irmscher's counterclaim against Rose. *Page 19 
Additionally, the entry indicated that pursuant to Civ.R. 41(A)(1)(b) and upon stipulation of the parties, Appellants voluntarily dismissed the second claim of the amended complaint without prejudice and Irmscher voluntarily dismissed his counterclaim against Rose without prejudice and that all pending, unresolved motions were withdrawn without prejudice. Finally, the trial court provided that it intended that its June 2006 entry granting summary judgment was to be a final appealable order and added Civ.R. 54(B) language to the entry.
 {¶ 32} It is from this judgment Appellants appeal, presenting the following assignments of error for our review.
 Assignment of Error No. I The court erred in granting summary judgment to John Irmscher, Fanning/Howey, Associates, Inc. (Fanning Howey), Tom Knapke, and Chuck Samples.
 Assignment of Error No. II The court erred in ruling that the appellants did not justifiably rely on the private and public representations by John Irmscher that Irmscher, Fanning/Howey Associate (Sic.), Inc., Tom Knapke, and Chuck Samples would be/were partners in the golf course/housing project when appellants extended credit to the actual or apparent partnership.
 Assignment of Error No. III The court erred in ruling that Fanning/Howey Associates, Inc., Tom Knapke, and Chuck Samples did not conceal false statements made by John Irmscher, nor that there was any fraudulent intent on their part. *Page 20 
 Assignment of Error No. IV The court erred in ruling that Ralph Bomholt was not concerned with who the partners were because he was dealing with John Irmscher.
 Assignment of Error No. V The court erred in ruling that Marjorie Miesse and Florentine Rose were unable to demonstrate that they relied upon any representations made by Irmscher.
 {¶ 33} Due to the nature of Appellants' assignments of error, we will address Appellants' fifth assignment of error first and address the remaining assignments together.
 Assignment of Error No. V {¶ 34} In their fifth assignment of error, Appellants assert that the trial court erred in ruling that Miesse and Rose were unable to demonstrate that they relied on Irmscher's representations. Specifically, Appellants assert that the trial court erred in failing to allow them to amend their complaint based on their January 2006 motion to amend. We agree.
 {¶ 35} In January 2006, Appellants moved to amend their amended complaint by substituting Dennis Howick as the Guardian for his incompetent father, Harold Howick, and Rick Rose for his incompetent mother, Florentine Rose, and by adding two parties, Rick Rose, as the Executor of the Estate of *Page 21 
Arlington Rose, Deceased and Miesse, as the Executor of the Estate of Robert O. Miesse, Deceased.
 {¶ 36} Upon our review of the record, it appears that the trial court never specifically ruled on this motion. However, we do note that the trial court expressly declined to consider certain evidence offered on behalf of the parties, which appears to show that it had denied the requested substitution of parties. Generally, when a trial court fails to rule on a motion, the appellate court will presume the trial court overruled the motion. Seff v. Davis, 10th Dist. No. 03AP-159,2003-Ohio-7029, ¶ 16. Thus, we will presume that the trial court overruled Appellants' motion for leave to amend.
 {¶ 37} Civ.R. 15(A) provides that a party may amend its pleading by leave of court and that such leave "shall be freely granted when justice so requires." Turner v. Cent. Local School Dist, 85 Ohio St.3d 95, 99, 1999-Ohio-0207. While the rule allows for liberal amendment, motions should be refused if there is a showing of bad faith, undue delay, or undue prejudice to the opposing party. Id. The primary consideration is actual prejudice to the opposing party because of the delay.Schweizer v. Riverside Methodist Hospitals (1996), 108 Ohio App.3d 539,546.
 {¶ 38} A trial court's decision to grant or deny a motion for leave to amend a pleading is discretionary and will not be reversed absent an abuse of discretion. *Page 22 State ex rel. Askew v. Goldhart (1996), 75 Ohio St.3d 608, 610,1996-Ohio-448. An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. Id.
 {¶ 39} In this case, Appellants sought to add parties to represent the claims of parties who were privy to the agreements executed in 1994, because the parties to be replaced had either passed away or had become incompetent. While we recognize that the case had already been litigated for approximately twenty months and the parties had engaged in a great deal of pretrial discovery, Civ.R. 15(A) allows for liberal amendment and motions should only be refused if there is a showing of bad faith, undue delay, or undue prejudice to the opposing party. Turner, supra. With this in mind, we find that there was arbitrariness and unreasonableness in the trial court's failure to rule on Appellants' motion for leave to amend their complaint and the effective denial of the motion, which resulted in the trial court declining to consider certain proffered evidence. Accordingly, Appellants' fifth assignment of error is sustained.
 Assignments of Error Nos. I, II, III, IV {¶ 40} In their first assignment of error, Appellants assert that the trial court erred in granting summary judgment in favor of Irmscher, Fanning/Howey, Knapke, and Samples. In their second assignment of error, Appellants assert that the trial court erred in ruling that they did not justifiably rely on Irmscher's private *Page 23 
and public representations. In their third assignment of error, Appellants assert that the trial court erred in ruling that Fanning/Howey, Knapke, and Samples did not conceal Irmscher's false statements and did not have fraudulent intent in failing to disclose that they created corporations to represent their interests in Lakewood. In their fourth assignment of error, Appellants assert that the trial court erred in ruling that Bomholt was not concerned with whom Lakewood's general partners were, because he was dealing with Irmscher.
 Standard of Review {¶ 41} An appellate court reviews a summary judgment order de novo.Wampler v. Higgins, 93 Ohio St.3d 111, 127, 2001-Ohio-1293; Hillyer v.State Farm Mut. Auto. Ins. Co. (1999), 131 Ohio App.3d 172, 175. Accordingly, a reviewing court will not reverse an otherwise correct judgment merely because the lower court utilized different or erroneous reasons as the basis for its determination. Diamond Wine Spirits, Inc.v. Dayton Heidelberg Distr. Co., 148 Ohio App.3d 596, 2002-Ohio-3932, at ¶ 25, citing State ex rel. Cassels v. Dayton City School Dist. Bd. ofEd., 69 Ohio St.3d 217, 222, 1994-Ohio-92. Summary judgment is appropriate when, looking at the evidence as a whole: (1) there is no genuine issue as to any material fact; (2) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made; and, therefore (3) the moving party is *Page 24 
entitled to judgment as a matter of law. Civ.R. 56(C); Horton v. HarwickChemical Corp., 73 Ohio St.3d 679, 686-87, 1995-Ohio-286. Summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the non-moving party.Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 345, 360.
 {¶ 42} The party moving for summary judgment has the initial burden of producing some evidence which affirmatively demonstrates the lack of a genuine issue of material fact. State ex rel. Burnes v. Athens CityClerk of Courts, 83 Ohio St.3d 523, 524, 1998-Ohio-3; see, also,Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; they may not rest on the mere allegations or denials of their pleadings. Id.
 II. Analysis {¶ 43} For ease of reading, we begin with discussing Rose, Miesse, and Harold Howick's claims against Irmscher, Fanning/Howey, Knapke, and Samples. Then, we will discuss the remaining appellants' claims against Irmscher. We will conclude by discussing the remaining appellants' claims against Fanning/Howey, Knapke, and Samples.
 A. Rose's, Miesse's, and Harold Howick's Claims *Page 25 {¶ 44} Based upon our disposition of Appellants' fifth assignment of error, the trial court's grant of summary judgment against Rose and Miesse was premature, because the trial court erred in not allowing Rose and Miesse to be replaced as parties. Additionally, based on the same rationale we applied in our discussion of the fifth assignment of error, we find that the trial court's grant of summary judgment against Harold Howick was premature. Accordingly, we sustain Appellants' assignments of error insofar as they relate to the claims originally raised by Rose, Miesse, and Harold Howick.
 B. Claims Against Irmscher {¶ 45} On appeal, Appellants argue that the trial court erred when it found that they did not justifiably rely on Irmscher's public and private statements. As Appellants properly provide in their appellate brief, "The [trial] court found that there was evidence upon which the trier of facts could find all of the elements of fraud as to Irmscher and evidence of R.C. § 1775.15 liability, except justifiable reliance." (Appellants' Brief p. 4). The nexus of Appellants' argument is that reasonable minds can differ when construing all of the evidence most favorably that they justifiably relied on Irmscher's representations. Specifically, Appellants assert that they justifiably relied on the four newspaper articles in The Daily *Page 26 Standard[17], Irmscher's representations made at the March 9, 1994 meeting, and Irmscher's representations made at their respective homes.
 {¶ 46} In order to satisfy a claim for fraud, each plaintiff must prove the following: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." Groob v. Keybank, 108 Ohio St.3d 348, 357,2006-Ohio-1189, ¶ 47, quoting Gaines v. Preterm-Cleveland Inc. (1987),33 Ohio St.3d 54, 55.
 {¶ 47} Establishing justifiable reliance does not require a showing that a plaintiffs reliance conformed to what a "reasonable man" would have believed. Amerifirst Savings Bank of Xenia v. Krug (1999),136 Ohio App.3d 468, 496. Rather, a determination regarding justifiable reliance involves a fact based inquiry into the circumstances of the claim and the relationship between the parties. Lepera v. Fuson (1992),83 Ohio App.3d 17, 26. "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances there is no apparent reason to doubt the veracity of the *Page 27 
representation." Crown Property Development, Inc. v. Omega Oil Co.
(1996), 113 Ohio App.3d 647, 657. However, there must be a balance between reliance and responsibility:
 The rule of law is one of policy and its purpose is, while suppressing fraud on the one hand, not to encourage negligence and inattention to one's own interests. There would seem to be no doubt that while in ordinary business transactions, individuals are expected to exercise reasonable prudence and not to rely upon others with whom they deal to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the simple-minded or unwary.
Krug, 136 Ohio App.3d at 495-96, quoting 50 Ohio Jurisprudence 3d (1984), Fraud and Deceit, Section 132.
 {¶ 48} We readily acknowledge that a reasonably prudent seller may well have questioned Irmscher's representations and conducted their own investigation into the matter. Under Ohio law, a person is required to exercise proper vigilance in dealing with others and, at times, to reasonably investigate before relying on statements or representations. See Harrel v. Solt, 4th Dist. No. 00CA027, 2000-Ohio-1964. Nevertheless, we cannot say, as a matter of law, that Appellants were not justified in relying on Irmscher's representations. Given the particular facts and circumstances of the case, this question is one best left to the trier of fact to determine. See Crown Property, 113 Ohio App.3d at 657;Brothers v. Morrone-O'Keefe Dev. Co., LLC, 10th Dist. No. 03AP-119,2003-Ohio-7036, ¶¶ 36-38. *Page 28 
 {¶ 49} It is undisputed that Irmscher knew Knapke, Fanning/Howey, and Samples created closely held corporations to represent their interests in Lakewood. Additionally, Appellants indicated that they relied on the four newspaper articles, which indicated that Irmscher, Knapke, Fanning/Howey, and Samples were going to be general partners in Lakewood, when they decided to extend their respective agreements.
 {¶ 50} Also, in support of granting summary judgment on Appellants' fraud claims against Irmscher, the trial court found "[n]o landowner examined any public records to determine who was a partner and who was not a partner, although timely filings were made months prior to the closings in August of 1994." (June 2006 Judgment Entry p. 6). However, the version of R.C. 1782.15 in effect at the time of Lakewood's filings provides,
 If a limited partnership has complied with the requirements of section 1329.01 of the Revised Code, the fact that a certificate of limited partnership is on file in the office of a county recorder is notice that the partnership is a limited partnership and that the persons designated in the certificate as limited partners are limited partners. It is not notice of any other fact.
R.C. 1782.15 (emphasis added). Therefore, the filing of Lakewood's limited partnership certificate would have put Appellants on notice of whom Lakewood's limited partners were, but according to the statute, the filing does not provide notice of whom the general partners were. *Page 29 
 {¶ 51} Further, Irmscher testified that at the March 9, 1994 meeting, he explained that Knapke would help him raise funds for Eaglebrooke; that Samples would be the primary housing builder; and, that Fanning/Howey was the architect for the project. Also, there was testimony that if some of the Appellants had known that Irmscher, Knapke, Samples, and Fanning/Howey were not making a personal commitment to the project, they would have never sold their family farm. Additionally, the trial court found that "[n]one of the Plaintiffs except Ralph Bomholt had an understanding of the doing of business in the corporate form and none sought any understanding of the nature of the transaction, the nature of the participants or the obligations created by the documents." (June 2006 Judgment Entry, p. 6).
 {¶ 52} Assuming all this to be true, as we must for purposes of summary judgment, Appellants were arguably misled into believing Irmscher, Knapke, Fanning/Howey, and Samples were general partners in Lakewood, rather than their representative corporations. Thus, sufficient evidence exists to survive a motion for summary judgment and present the Appellants' fraud claims against Irmscher to the trier of fact.
 {¶ 53} We now turn to Appellants' claims against Irmscher based upon Ohio's partnership by estoppel statute, R.C. 1775.15[18], which provides: *Page 30 
 (A) Subject to section 1339.65 of the Revised Code, when a person, by words spoken or written or by conduct, represents himself or consents to another representing him to anyone, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.
 (1) When a partnership liability results, he is liable as though he were an actual member of the partnership.
 (2) When no partnership liability results, he is liable jointly with the other persons, if any, so consenting to the contract or representation as to incur liability, otherwise separately.
(Emphasis added).
 {¶ 54} As the trial court noted,
 [Appellants] have produced some evidence that Irmscher made both private and public representations concerning the status of the individual Defendants as `partners.' As to the private representations the element of reasonable reliance applies as it did in the case of fraud. The statute provides that liability exists in favor of anyone to whom such representation was made, who has on the faith of the representation given credit. This is the equivalent of the justifiable reliance component of the fraud claim. Their reliance was not reasonable and they did not act as reasonably prudent business people. The result on that issue will be the same. As to any non-public representations, [Appellants'] claims under Section 1775.15 must fail and summary judgment will be granted accordingly in favor of each individual Defendant and against each individual Plaintiff.
(June 2006 Judgment Entry p. 7) (emphasis added). *Page 31 
 {¶ 55} In order to create a partnership by estoppel, three basic requirements must be met:
 (1) a person represents himself as a partner or consents to another representing him as a partner; (2) a person * * * to whom such representation has been made relies on this representation; and (3) based on this reliance, the claimant gives credit to the apparent partnership.
Fiberized Prod., Inc. v. Crocker (April 15, 1993), 10th Dist. No. 92AP-975, 1993 WL 120092.
 {¶ 56} Again, we readily acknowledge that a reasonably prudent seller may well have questioned Irmscher's representations and conducted their own investigation into the matter. Under Ohio law, a person is required to exercise proper vigilance in dealing with others and, at times, to reasonably investigate before relying on statements or representations. See Solt, supra. Nevertheless, we cannot say, as a matter of law, that Appellants did not rely on Irmscher's representations. Given the particular facts and circumstances of the case, this question is one best left to the trier of fact to determine. See Crown Property,113 Ohio App.3d at 657; Brothers, supra, 2003-Ohio-7036, ¶¶ 36-38.
 {¶ 57} Irmscher testified that at the March 9, 1994 meeting, he identified that Lakewood's general partners were him, Samples, Fanning/Howey, and Knapke. Also, Irmscher testified that Knapke would help him raise funds for Eaglebrooke; that Samples would be the primary housing builder; and, that *Page 32 
Fanning/Howey was the architect for the project. Appellants also provided evidence that if some of them had known that Irmscher, Knapke, Samples, and Fanning/Howey were not making a personal commitment to the project, they would have never sold their family farm. Additionally, Appellants indicated that they relied on the four newspaper articles, which indicated that Irmscher, Knapke, Fanning/Howey, and Samples were going to be general partners in Lakewood, when they decided to extend their respective agreements.
 {¶ 58} Assuming all this to be true, as we must for purposes of summary judgment, Appellants were arguably misled into believing Irmscher, Knapke, Fanning/Howey, and Samples were general partners in Lakewood rather than their representative corporations. Thus, sufficient evidence exists to survive a motion for summary judgment and to present the Appellants' partnership by estoppel claims against Irmscher to the trier of fact.
 C. Claims Against Knapke, Fanning/Howey, Samples {¶ 59} On appeal, Appellants argue that the trial court erred in ruling that Fanning/Howey, Knapke, and Samples did not conceal Irmscher's false statements and did not have fraudulent intent in failing to disclose that they created corporations to represent their interests in Lakewood. The nexus of Appellants' argument is that reasonable minds can differ when construing all of the evidence *Page 33 
most favorably and that they have valid fraud and partnership by estoppel claims against Fanning/Howey, Knapke, and Samples.
 {¶ 60} In this case, Appellants base their claims on the fact that "[Fanning/Howey, Knapke, and Samples] should have corrected Irmscher at the March 9, 1994, meeting if the individuals were not intending to be general partners. Their silence, their concealment of the fact that they intended for their corporations to be general partners with Irmscher's corporation in [Lakewood], is what amounts to the "secret". They had a duty to speak, to correct Irmscher's false statement that [Fanning/Howey], [Knapke], and [Samples] were his general partners in Lakewood." (Appellants' Brief p. 10).
 {¶ 61} The Ohio Supreme Court has held that a party cannot maintain an action for fraud when the fraudulent representations were not made to him to induce him to act. Wells v. Cook (1865), 16 Ohio St. 67, syllabus; see, Moses v. Sertling Commerce America, Inc., 10th Dist. No. 02AP-161, 2002-Ohio-4327, at ¶ 21. Therefore, based on Appellants' argument, only the appellants who were at the March 9, 1994, meeting could possibly claim that Fanning/Howey's, Knapke's, and Samples' failure to correct Irmscher's representations that they were general partners in Lakewood was fraudulent. Accordingly, we find that the trial court did not err in granting summary judgment on Dennis and David Howick's fraud and partnership by estoppel claims against Fanning/Howey, *Page 34 
Knapke, and Samples, because Dennis and David Howick did not attend the March 9, 1994, meeting.
 {¶ 62} Therefore, we are left with Bomholt and Luke and Jacqualyn Springer as the only appellants with a potentially valid fraud and partnership by estoppel claims against Knapke, Fanning/Howey, and Samples, because Luke, Bomholt's son, Douglas Bomholt,[19] and son-in-law were at the March 9, 1994 meeting, where Appellants' allege that Fanning/Howey, Knapke, and Samples should have corrected Irmscher if they were not intending to be general partners in Lakewood.
 {¶ 63} Upon our review of the record, there is no evidence that Fanning/Howey, Knapke, and Samples ever represented that they were general partners in Lakewood. Also, there is undisputed evidence that prior to Bomholt and the Springers' extending their options, Fanning/Howey, Knapke, and Samples properly filed the appropriate documents to create corporations to represent their interests in Lakewood and that a Certificate and Agreement of Limited Partnership for Lakewood, which listed their corporations as its general partners, was filed with the Mercer County Recorder's Office.
 {¶ 64} Therefore, we agree with the trial court that "[although it is alleged that [Fanning/Howey, Knapke, and Samples] secretly formed corporations to *Page 35 
deceive the landowners, the evidence presented does not support that proposition." Assuming that Fanning/Howey, Knapke, and Samples had a duty to correct Irmscher, which argument Appellants fail to support with case law, we cannot find that Fanning/Howey, Knapke, and Samples possessed the requisite intent required to support a fraud claim. Therefore, we find that the trial court did not err in granting summary judgment on the remaining Appellants' fraud claims against Fanning/Howey, Knapke, and Samples.
 {¶ 65} As noted above, in order for Bomholt and the Springers to create a partnership by estoppel, three basic requirements must be met:
 (1) a person represents himself as a partner or consents to another representing him as a partner; (2) a person * * * to whom such representation has been made relies on this representation; and (3) based on this reliance, the claimant gives credit to the apparent partnership.
Crocker, supra.
 {¶ 66} In this case, there is evidence that at the March 9, 1994 meeting Irmscher indicated that Fanning/Howey, Knapke, and Samples were general partners in Lakewood and that Fanning/Howey, Knapke, and Samples did not correct Irmscher's representation. Additionally, there is evidence that the Springers relied on the representation that Fanning/Howey, Knapke, and Samples were general partners when they decided to extend their option. Accordingly, we *Page 36 
cannot say, as a matter of law, that the Springers cannot sustain a partnership by estoppel claim against Fanning/Howey, Knapke, and Samples. Given the particular facts and circumstances of the case, this question is one best left to the trier of fact to determine.
 {¶ 67} Turning to Bomholt's claim under partnership by estoppel, the trial court found that based on Bomholt's deposition testimony "that [Bomholt] was not concerned with who the partners were because he was dealing with John Irmscher"; that "he indicated a lack of concern as to [the partners'] relationship to the business"; and, that "he understood the concepts of corporate liability and personal liability and that Irmscher would not be personally liable." (June 30, 2006 Judgment Entry, p. 4). However, on appeal, Appellants argue that Bomholt was confused as to whether Fanning/Howey's attorney, who asked the deposition questions, was referring to the "general" or "limited" partners of Lakewood. As a result of Bomholt's alleged confusion, Appellants contend that the trial court erred in ruling that Bomholt was not concerned with who were Lakewood's general partners, because he was dealing with Irmscher. Assuming this is true, we cannot say, as a matter of law, that Bomholt cannot sustain a partnership by estoppel claim against Fanning/Howey, Knapke, and Samples. Given the particular facts *Page 37 
and circumstances of the case, this question is one best left to the trier of fact to determine.
 III. Conclusion {¶ 68} Based on the aforementioned, we overrule and sustain Appellants' remaining assignments of error consistent with the following findings: We find that the trial court erred in granting summary judgment against Miesse, Rose, and Harold Howick; in granting summary judgment in favor of Irmscher on David and Dennis Howick's, Bomholt's, and the Springers' fraud and partnership by estoppel claims; and, in granting summary judgment in favor of Fanning/Howey, Knapke, and Samples on Bomholt's and the Springers' partnership by estoppel claim. Additionally, we find that the trial court did not err in granting summary judgment in favor of Fanning/Howey, Knapke, and Samples on David and Dennis Howick's, Bomholt's and the Springers' fraud claims and in granting summary judgment in favor of Fanning/Howey, Knapke, and Samples on David and Dennis Howick's partnership by estoppel claims.
 {¶ 69} Accordingly, the judgment of the trial court is affirmed in part, reversed in part, and remanded back to the trial court for further proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
 PRESTON and WILLAMOWSKI, JJ., concur.
[1] During her deposition, Miesse identified a document entitled "Bob Miesse additions and questions", which she prepared six weeks prior to the execution of Robert Miesse's option. The document indicated that on "Page 1 [of the option agreement] remove Marjories name Her name not on certificate of ownership." (Miesse Aug. 22, 2005 Dep. pp. 35-36 and Exs. M Q).
[2] In February 1994, prior to the creation of Lakewood, Irmscher, Fanning/Howey, Knapke, and Samples created corporations for the purpose of being the general partners of Lakewood and to represent each investor's ownership interest in Lakewood: Irmscher created Irmscher Development, Fanning/Howey created F/H Investments, Knapke created Knapke Associates, and Samples created Samples Associates.
[3] Upon our review of the record, it appears that Luke Springer, Douglas Bomholt, who is Bomholt's son, Ralph Weitzel, who is Douglas Bomholt's brother-in-law, and the Roses attended this meeting, while Jacqualyn Springer, the Howicks, and Bomholt did not. Also, Miesse testified that she "probably" attended this meeting. (Miesse Aug. 22, 2005, Dep. p. 12).
[4] It is unclear whether Irmscher or Lakewood called the March 1994 meeting. Specifically, in Luke Springer's affidavit attached to Appellants' response to the motions for summary judgment, he provides "My wife and I received an invitation to attend a meeting to discuss the project on March, 9, 1994. I was given an agenda in writing. That agenda is captioned "LAKEWOOD VILLAGE LIMITED PARTNERSHIP"; and "RE: MEETING WITH LANDOWNERS (Sic.) ON 3/9/94" bearing "Date: March 9, 1994." Also, in the affidavit from Douglas Bomholt, Bomholt's son who attended the March 9, 1994 meeting on his father's behalf, Douglas provided that "In March of 1994, my father called me from his Florida winter home and asked me to attend, in his behalf, a meeting scheduled for March 9, 1994, by the partnership that was formed to develop our farm into a golf course/housing project." However, in Dennis Howick's affidavit, he provides "We received the notice of the meeting called by Irmscher for March 9, 1994, to discuss the project."
[5] Upon our review of the record, we find four newspaper articles from The Daily Standard. Specifically, the March 25, 1993 edition, on the "Money" page, contained an article that provided "Celina-based [Fanning/Howey] also is a partner with Irmscher in the golf course and housing project." (Bomholt Sept. 26, 2005 Dep. Ex. 1). The June 9, 1993 edition contained an article about Irmscher's partnership, which provided that "At the June 14[, 1993] meeting [of the Celina City Council], Irmscher said, a representative of the Celina-based [Fanning/Howey] architectural engineering firm, a partner in [Eaglebrooke], will be on hand to answer questions, as well as [Knapke], who will be joining Irmscher's firm as vice president of development after his imminent retirement from Wright State University Lake Campus June 30." (Bomholt Sept. 26, 2005 Dep. Ex. 2). The November 9, 1993 edition contained an article about the November 8, 1993, Celina City Council Meeting, whereat, "Irmscher * * * listed several of his development partners, including local contractor [Samples], Irmscher Development partner [Knapke], and [Fanning/Howey]." (Bomholt Sept. 26, 2005 Dep. Ex. 3). The August 5, 1994 edition contained an article that provided "In addition, [Irmscher] has three general partners — Fanning/Howey Associates, Tom Knapke and Chuck Samples, who have contributed a combined total of $800,000 to the project; and raised $1.1 million through the sale of 31 limited partnerships." (Bomholt Sept. 26, 2005 Dep. Ex. 4).
[6] Jacqualyn Springer also filed an affidavit which provided substantially the same information.
[7] Ralph Weitzel also provided an affidavit that comported with Doug Bomholt's.
[8] See footnote 5.
[9] In Ronald Fanning's deposition, he indicated that he was Fanning/Howey's "chairman of the board" and "work[ed] as principal in charge of projects." (Fanning May 9, 2005 Dep. pp. 6-7).
[10] On January 12, 2006, Dennis was appointed guardian of his father, Harold Howick.
[11] David Ho wick also provided an affidavit that substantially comported with Dennis' affidavit.
[12] See footnote 5.
[13] See footnote 5.
[14] See footnote 5.
[15] All documents were signed in the name of Lakewood by Irmscher as president of Irmscher Development.
[16] Specifically, Paragraph 3 of the Note Assumption Agreement provides "Lakewood is aware that the Roses are releasing Irmscher from liability on the Note, and Lakewood specifically acknowledges that such release shall not affect the liability of Lakewood to pay when due the indebtedness evidenced by the Note and to perform and comply with all of the terms, covenants and conditions of the Note pursuant to this Agreement." (Joint Ex. 64 pp. 1-2). Also Paragraph 7 provided, "The Roses, if they see fit to take action to enforce the collection of the indebtedness evidence by the Note, by foreclosure of the New Mortgage or otherwise, hereby agree that they will never institute any action, suit, claim or demand, in law or in equity, against Irmscher, for or on account of any deficiency; it being the intention and effect of this Agreement that insofar as Irmscher is concerned, the Roses' recovery shall be confined to the value of the property encumbered by the New Mortgage and any other assets of Lakewood." (Joint Ex. 64 p. 2).
[17] See footnote 5.
[18] R.C. 1775.15 was amended by 2006 H 416, which became effective on January 1, 2007.
[19] We note that Luke Springer was the only Appellant who actually attended the March 9, 1994 meeting. However, there is evidence that Bomholt sent his son to represent him at that meeting and it can be reasonably inferred that Luke represented his wife, Jacqualyn, at the meeting. *Page 1